## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**Justo L González-Trápaga**
Plaintiff

v.

**Mayagüez Medical Center Dr. Ramón Emeterio Betances, Inc., et al.**
Defendants

Civil No. 15-1342 (DRD)

### OPINION & ORDER

With rare exception, the individual rights honored in our constitution are not meant to be invoked so as to interfere with the interactions between private parties.  As such, though a myriad of legal remedies have been developed over the course of our history, to this day, sins of a constitutional dimension ordinarily entail some reasonable degree of state action.  This traditional requirement is profoundly entangled with the deepest roots of our constitutional jurisprudence.  Today, this Court is once again called upon to draw the line between wrongs of a state and wrongs of a private party.

### I.   OVERVIEW

Dr. Justo L. González-Trápaga ("Plaintiff") is suing the Municipality of Mayagüez ("the Municipality"), the Mayagüez Medical Center Dr. Ramón Emeterio Betances, Inc. ("MMC"), the Vice President for Operations Jaime Maestre-Grau ("the Vice President"), the Executive Director Ildefonso Vargas-Feliciano ("the Executive Director"), the Medical Director Dr. Milton D. Carrero-Quiñones ("the Medical Director"), and the President of the Medical Faculty Dr. Efraín Flores-De-Hostos ("the Faculty President," collectively "Defendants"). <u>See</u> Docket No. 1.

Specifically, Plaintiff seeks compensatory damages, permanent injunctive relief, and a declaratory judgment.  <u>See</u> Docket Nos. 1.  The remedies are sought under the deprivation of civil rights statute, see 42 U.S.C. § 1983; the Social Security Act, specifically 42 U.S.C. § 1395dd(d)(2)(A); and the Declaratory Judgment Act, specifically 28 U.S.C. § 2201.[1]  <u>See also</u> Federal Rules of Civil Procedure 57 and 65.  It should be noted that the Social Security Act claims are sought in the alternative to any other form of relief contained in the complaint.  <u>See</u> Docket No. 1 at ¶¶ 2-3.

Pending before the Court are two Rule 12(b)(6) motions—one by the Municipality and another by all other defendants—to dismiss the complaint on several distinct grounds. <u>See</u> Docket Nos. 13 and 16.  After tireless research, in-depth scrutiny, and thorough reflection, the Court hereby rules that Defendants' motions to dismiss are to be **GRANTED IN PART** and **DENIED IN PART**.

## II.   STANDARD OF REVIEW

Once confronted with an allegation regarding the sufficiency of a complaint, the Court must first turn to Federal Rule of Civil Procedure 8(a), which enumerates the minimum requirements of a valid complaint:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

---

[1] Defendants interpret the complaint to have also invoked a claim under the Federal Trade Commission Act; however, Plaintiff concedes that he raises no such claim.  <u>See</u> Docket No. 22 at ¶ 68.  In light of said concession, the phantom claim need not be addressed.

A motion under Rule 12(b)(6) must be granted when pleader fails "to state a claim upon which relief can be granted."  <u>See</u> Fed. R. Civ. P. 12(b)(6).  A 12(b)(6) motion to dismiss will succeed when the complaint's allegations do not comply with Rule 8(a)(2).  However, compliance with Rule 8(a)(2) has been the subject of much debate for decades in the legal community.

The Supreme Court sparked this discussion in 1957, when called upon to evaluate the sufficiency of a complaint:

> In appraising the sufficiency of the complaint [in this case] we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim **unless it appears <u>beyond doubt</u> that the plaintiff can prove <u>no set of facts</u> in support of his claim which would entitle him to relief**.  (emphasis provided).

<u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (overruled by <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007)).  This passage, embraced by our highest court, had been interpreted by many judges and commentators to mean that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." (alteration in original).  <u>Twombly</u>, 550 U.S. 544, 561 (2007) (describing the evil created by the controversial *Conley* passage).  However, such an interpretation harshly affects a defendant's desire to defend himself in a civil suit.  "[T]he threat of discovery expense [would] push cost-conscious defendants to settle even anemic cases."  <u>Id.</u> at 559.  Hence, many other judges and commentators, wary of these negative implications, declined to construe the Supreme Court's words in such a literal manner.  The debate between these two schools of thought raged on for decades.  Finally, this controversy was put to rest by the Supreme Court in 2007: "after puzzling the profession for 50 years, this famous

observation has earned its retirement."  Id. at 563 (followed by Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

The Supreme Court cleared the smoke and established that, in order to comply with Rule 8(a)(2), a complaint must state a "plausible" claim for relief, as opposed to merely stating a "possible" claim for relief.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, **the complaint has alleged—but it has not 'show[n]'**—that 'the pleader is entitled to relief.'"  (emphasis provided).  Iqbal, 556 U.S. at 679 (using the language of Fed. Rule Civ. Proc. 8(a)(2) to explain plausibility).  In order to "nudge [a claim] across the line **from conceivable to plausible**," the complaint must contain enough facts to support a claim for relief.  (emphasis provided).  Twombly, 550 U.S. at 570.

"This plausibility standard has become the 'new normal' in federal civil practice." Garcia-Catalan v. United States, 734 F.3d 100, 101 (1st Cir. 2013) (citing A.G. v. Elsevier, Inc., 732 F.3d 77, 78–79 (1st Cir. 2013)).  In other words, while Conley (arguably) states that a complaint with no more than conclusory allegations need not contain any supporting facts to comply with Rule 8(a)(2), both Iqbal and Twombly take the opposite point of view. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Iqbal, 556 U.S. at 678-79.

The doors of discovery only open when a complaint has "factual allegations [that] are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Garcia-Catalan, 734 F.3d at 103 (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678)); see also Garcia-Catalan, 734

F.3d at 103 ("The circumstances in the complaint create a reasonable expectation that discovery may yield evidence of the government's allegedly tortious conduct"; citing Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011)).  The First Circuit explains the relationship between a complaint's plausibility and discovery in more detail:

> . . . the plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case.  *See Twombly*, 550 U.S. at 556 (requiring, as a hallmark of plausibility, that a complaint contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence").

Garcia-Catalan, 734 F.3d at 104-05.  Notwithstanding, the First Circuit has been cautious when applying the plausibility analysis to certain types of cases.  Id. at 104 (citing Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012)).  "Generally speaking, these are cases in which a material part of the information needed [by the plaintiff] is likely to be within the defendant's control."  Id.  This caution is not in contravention with the Supreme Court's detailed plausibility standard:

> Because precise knowledge of the chain of events leading to the [claim] may often be unavailable to a plaintiff at this early stage of the litigation, we take to heart the Supreme Court's call to "draw on our 'judicial experience and common sense' as we make a contextual judgment about the sufficiency of the pleadings."  *See Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950).

Ocasio-Hernandez, 640 F.3d at 16

Moreover, both the Supreme Court and the First Circuit have cautioned against equating a plausibility analysis with an analysis of a plaintiff's likely success on the merits.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely") (internal quotation marks omitted); Sepúlveda-

Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010) (affirming that the plausibility standard assumes properly pleaded facts to be true and are to be read in plaintiff's favor) (citing Twombly, 550 U.S. at 556); see also Ocasio-Hernandez, 640 F.3d at 12 (citing Twombly, 550 U.S. at 556) ("[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable'").    Instead, the First Circuit has emphasized that "[t]he make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, [but] not a merely conceivable, case for relief."  Sepúlveda-Villarini, 628 F.3d at 29; see also Iqbal, 556 U.S. at 681 ("To be clear, we do not reject . . . bald allegations on the ground that they are unrealistic or nonsensical . . . It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.")

The First Circuit has mapped out the proper methodology to adequately analyze the plausibility of the claims present in a complaint:

> **Step one:** isolate and ignore statements in the complaint that **simply** offer legal labels and conclusions or **merely** rehash cause-of-action elements. (emphasis provided)

Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio-Hernandez, 640 F.3d at 12; Iqbal, 556 U.S. 662; and Twombly, 550 U.S. at 555.)). This is an exception to the general rule that "a court must accept as true all of the allegations contained in a complaint."  Iqbal, 556 U.S. at 678.  As such, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action."  Ocasio-Hernandez, 640 F.3d at 12, (citing Iqbal, 556 U.S. at 680). Slightly restated, "[a] complaint 'must contain more than a rote recital of the elements of a cause of action,' but need not include 'detailed factual allegations.'"  Rodriguez-Vives v.

Puerto Rico Firefighters Corps of Puerto, 743 F.3d 278, 283 (1st Cir. 2014) (citing Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013) (reiterated by Garcia-Catalan, 734 F.3d at 103)).  Notwithstanding, a second exception was carved out from *Twombly* by the First Circuit: "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual."  Peñalbert–Rosa v. Fortuño–Burset, 631 F.3d 592, 595 (1st Cir. 2011) (citing Twombly, 550 U.S. at 557 n.5 ("The border in [DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)] was the line between the conclusory and the factual.  Here it lies between the factually neutral and the factually suggestive.  Each must be crossed to enter the realm of plausible liability.")).  The First Circuit, in a separate case, expounded upon these two exceptions:

> A conclusory allegation . . . is one which simply asserts a legal conclusion, such as "I was retaliated against," not a specific factual allegation, such as "my supervisor threw a book at me," that merely lacks some surrounding context. *See Ocasio-Hernández*, 640 F.3d at 13-14.  We have held that some factual allegations may be so "threadbare" that they are in essence conclusory even if they include more than an assertion that an element of a cause of action was satisfied. *See Peñalbert-Rosa*, 631 F.3d at 595–96 (1st Cir. 2011). But this is only the case where the bareness of the factual allegations makes clear that the plaintiff is merely speculating about the fact alleged and therefore has not shown that it is plausible that the allegation is true. Id.

Rodriguez-Vives, 743 F.3d at 286.

After duly describing *step one* in detail, the First Circuit continued their meticulous methodology of identifying a complaint's plausibility:

> **Step two:** take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.  *Ocasio-Hernandez*, 640 F.3d at 12 (again, discussing *Iqbal* and *Twombly*, among others); *see also S.E.C. v. Tambone*, 597 F.3d 436, 441–42 (1st Cir. 2010) (en banc).

> Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels us "to draw on" our "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And in performing our review, we realize too that we can consider (a) "implications from documents" attached to or fairly "incorporated into the complaint," (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." *Arturet–Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n. 2 (1st Cir. 2005); *see also Haley v. City of Boston*, 657 F.3d 39, 44, 46 (1st Cir. 2011). (emphasis provided).

Schatz, 669 F.3d at 55-56 (footnote omitted).  Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation."  Id. at 682 (citing Twombly, 550 U.S. at 567); see also Id. at 680 ("Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. [Twombly] at 567."). "Specific information, even if not in the form of admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not."  Penalbert-Rosa, 631 F.3d at 596. Nevertheless, "[n]othing about the plausibility standard requires a court to blind itself to what is obvious."  Grajales v. Puerto Rico Ports Authority, 682 F.3d 40, 48 (1st Cir. 2012). When considering a motion to dismiss, the court's inquiry occurs in a two-step process under the current context-based "plausibility" standard established by *Twombly* and *Iqbal*. "Context-based" means that a Plaintiff must allege sufficient facts that comply with the basic elements of the cause of action.  See Iqbal, 556 U.S. at 671-72 (concluding that plaintiff's complaint was factually insufficient to substantiate the required elements of a *Bivens* claim, leaving the complaint with only conclusory statements).  However, the First Circuit has also cautioned courts that a plausibility analysis should not be done "too mechanically":

> We emphasize that the complaint must be read as a whole. *See Elsevier*, 732 F.3d at 81–83. As we have explained, "[t]here need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action." *Rodríguez–Reyes*, 711 F.3d at 55. "For pleading purposes, circumstantial evidence often suffices to clarify a protean issue." Id. at 56 (internal quotation marks omitted).

Garcia-Catalan, 734 F.3d at 103. Finally, at the expense of overstressing the obvious, "an adequate complaint must include not only a plausible claim but also a plausible defendant." Penalbert-Rosa, 631 F.3d at 594.

When courts are called upon to assess a Rule 12(b)(6) motion to dismiss (or a Rule 12(c) motion for judgment on the pleadings), they may not consider any matters outside of the pleadings unless the motion is treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). Should a 12(b)(6) motion (or a 12(c) motion) be converted into a motion for summary judgment, the "parties must be given a reasonable opportunity to present all the material that is pertinent to the [newly converted motion]." Id. The First Circuit has expounded on this principle:

> Although we do not "mechanically enforce the requirement of express notice of a district court's intention to convert a Rule 12(b)(6) motion into a motion for summary judgment," we do guard against allowing such a conversion where it would come as a "surprise" or be "unfair" to the party against whom judgment is rendered.

Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 31 (1st Cir. 2000) (citing Chaparro-Febus v. International Longshoremen Ass'n, Local 1575, 983 F.2d 325, 332 (1st Cir. 1992)). The First Circuit has been quite thorough in delineating between what matters are considered a part of the pleadings and what matters are not:

> . . . in reviewing a 12(b)(6) [motion], it is well-established that in reviewing the complaint, we **"may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment."** *Shaw v. Digital Equip. Corp.*, 82 F.3d

1194, 1220 (1st Cir. 1996) (citing *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (explaining that the main problem of looking to documents outside the complaint - lack of notice to plaintiff - is dissipated "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint")). "Were the rule otherwise, a plaintiff could maintain a claim . . . by excising an isolated statement from a document and importing it into the complaint . . . ." *Id.*; *see also Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations").  (emphasis added).

Id. at 32 (cited in approval in Schatz, 669 F.3d at 55-56).

Having presented a summary of the applicable standard under Federal Rule of Civil Procedure 12(b)(6), the Court may address allegations contained in the complaint.

## III.   THE COMPLAINT

Faced with motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "assume[s] the truth of all well-pleaded facts in the complaint and indulge[s] all reasonable inferences that fit the plaintiff's stated theory of liability."  Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 291 (1st Cir. 2015) (citing Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 13 (1st Cir. 2009) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005)).  With that being said, it should be noted that the complaint is rather jumbled, unclear, and, on some levels, difficult to comprehend.  Nevertheless, the Court has put forth the effort to present the factual allegations in their properly intended light, while consistently making reference to the precise portions of the complaint from which these facts were drawn.  Moreover, for ease of read, the Court dispenses with the overuse of qualifying phrases such as "allegedly," "purportedly," and "supposedly" when reciting the particulars of the instant complaint. Notwithstanding this method of expression, the Court is well aware of the prospect that not

everything contained in the complaint is necessarily true or even plausible.  The chronicle is conveyed below.

The Municipality acquired certain hospital facilities from the Puerto Rico Department of Health in September of the year 2000.  Docket No. 1 at ¶ 14.  On January 29, 2010, the Municipality and MMC—"a corporation organized under the laws of . . . Puerto Rico"— entered into a contract with the following general arrangements: MMC would pay the Municipality just about $25 million in order to lease, operate, and administer these hospital facilities.  Id. at ¶¶ 9, 14, and 18.

Plaintiff is a "solo practitioner" nephrologist with a private practice located in Mayagüez, Puerto Rico.  See Docket No. 1 at ¶¶ 8 and 28.  In 1997, Plaintiff was granted "faculty" or "hospital privileges" at MMC.  Id. at ¶¶ 20 and 24.  As it stands, MMC is currently Plaintiff's "principal referral hospital."  Id. at ¶ 23.

MMC has certain bylaws that must be followed by the doctors who work there.  Specifically, these bylaws contain provisions establishing the procedure to be followed by doctors when requesting authorization for work absences.  Apparently, even though he complied with these work-absence provisions, Plaintiff was required to "make personal arrangements for his patients to be taken care of during his absence in the event of an emergency" instead of MMC setting up "the federally mandated institutional on-call duty roster."[2]  Id. at ¶ 27.

---

[2] This on-call duty roster requirement is found in 42 U.S.C. § 1395cc, which is enclosed below:

Agreements with providers of services; enrollment processes
(a) Filing of agreements; eligibility for payment; charges with respect to items and services
 (1) Any provider of services (except a fund designated for purposes of section 1395f(g) and section 1395n(e) of this title) shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—
 . . .

According to Plaintiff, this procedure of requiring doctors to make personal arrangements to have their patients duly attended to during their absences unevenly benefits practice-group doctors over solo practitioners like himself.  Apparently, this is due to the likelihood that these practice-group doctors would tend to have less difficulty in obtaining a substitute during their absences (i.e., another doctor from their practice group) than do solo practitioners.  Further, if MMC were to establish the on-call duty roster as required by federal law, this unequal treatment between practice-group and solo-practitioner doctors would disappear.

Even as Plaintiff complied with the bylaws for authorized absences, MMC, allegedly, was deliberately indifferent to the medical treatment of his patients during these scheduled absences.  Id. at ¶ 1.  Additionally, during these absences, MMC, the Medical Director, and the Faculty President told their doctors to transfer Plaintiff's patients to other hospitals, even when there were eleven other nephrologists available to provide service.  Id. at ¶¶ 30 and 37.  Also, as recent as January of 2015, one of Plaintiff's patients "transferred" to one of the nephrology practice groups during his vacation.  Id. at ¶ 87.  Moreover, also during Plaintiff's duly-notified absences, the majority of his patients were forced, under duress and coercion, to "renounce" Plaintiff "as their [n]ephrologist" and sign some sort of document that would memorialize their "loyalty" to another nephrologist practice group prior to receiving "life-saving emergency medical treatment."  Id. at ¶ 31.  These actions resulted in Plaintiff's patients receiving "inadequate medical treatment" as a result of these

---

(I) in the case of a hospital or critical access hospital--
. . .
**(iii) to maintain a list of physicians who are on call for duty after the initial examination to provide treatment necessary to stabilize an individual with an emergency medical condition,**
. . . (emphasis provided).

"unnecessary and life-threatening delays."  Id. at ¶ 32.  Further, these circumstances were contributing factors in the death of at least one patient.  Id.  The Medical Director—one of the defendants in this case—told Plaintiff that the refusal of other MMC nephrologists to provide emergency medical treatment to his patients was "his personal and exclusive problem."  Id. at ¶ 33.  In addition, the Medical Director emphasized that these refusals had "nothing to do with [MMC]."  Id.

The next phase of events revolves around the correspondence between the parties and the retaliatory actions it created.  On July 18, 2012, Plaintiff was informed by another doctor—who is not a party in this case—that "the other eleven [n]ephrologists with hospital privileges had refused to provide medical treatment to a renal patient because that person had a 'patient-physician relationship' with the Plaintiff."  Id. at ¶ 37.  As a result, on this same date, Plaintiff emailed the Medical Director—while copying the Executive Director, the mayor of Mayagüez, and several nonparties—regarding MMC's noncompliance with the aforementioned on-call duty roster statute.  Id. at ¶ 30.  As no response had been received, Plaintiff requested an audience to discuss this matter.  Id. at ¶ 40.  This request was granted and the discussion occurred, but no action was taken by Defendants to establish the on-call duty roster.  Id.  After Plaintiff insisted on a response, the Medical Director did so on December 10, 2012.  The Medical Director, presumably by way of an email, denied any violation to the statute in question (even though he admits that there is no on-call duty roster) or any other previously mentioned wrongdoing.  Id. at ¶¶ 42-45. This response was copied to the Vice President and placed in Plaintiff's faculty file.  Id. at ¶ 41.

Subsequently, there was a faculty meeting on February 5, 2013. Id. at ¶ 47. During the meeting, a fellow doctor—a nonparty—insisted on the need of the on-call duty program. Id. In light of this petition, Plaintiff took the opportunity to make yet another request for the on-call duty program. This time, Plaintiff sent a letter to the chairman of the medical faculty executive committee (a nonparty) on February 20, 2013. Id. at ¶ 48. The letter also called for an investigation regarding the delayed care of two nephrology patients in July of 2012. Id. at ¶ 51. In a March 6, 2013, letter, which was copied to two of the defendants (the Vice President and the Medical Director), the chairman responded with the following: that MMC is not in violation of the federal on-call duty statute, that the events related to the delayed care of the two patients never occurred, that this would be the second time Plaintiff makes the same allegations (referencing Plaintiff's July 18, 2012, letter), and that Plaintiff is to comply with the absence-related bylaws. Id. at ¶¶ 55-57. Moreover, no investigation regarding the delayed care of the two patients ever occurred. Id. at ¶ 51.

Subsequently, in response to a nonparty nephrologist practice group's separate (unspecified) proposal to amend the bylaws, Plaintiff issued a counterproposal on March 11, 2013. Id. at ¶ 58. Moreover, on April 1, 2013, by way of an email to the medical faculty, Plaintiff explained his opposition to the proposal. Id. at ¶ 59. Then, on April 30, 2013, the Medical Director issued a formal admonishment letter to Plaintiff for abandoning two hospitalized patients as a result of his absences from April 1 to April 9, 2013. Id. at ¶¶ 60 and 76. Further, the Medical Director warns Plaintiff that MMC would be forced to take action pursuant to the bylaws if he continues to abandon his patients. Id. at ¶ 61. Plaintiff interprets this last statement as meaning MMC would have Plaintiff's "hospital privileges"

revoked.  Id.  However, these absences were duly notified, these two patients were under the care of other physicians, and Plaintiff's involvement with these two patients was limited to him being "contacted solely as a consulting physician."  Id.

Next, at a medical faculty meeting held on May 6, 2013, Plaintiff's counterproposal for the on-call duty program was discussed and rejected by a majority vote.  Id. at ¶ 63. However, it should be noted that the number of attendees who were present at this meeting did not meet the required quorum.  Id.  Further, the majority of those who voted were the practice-group doctors.  Id.  At this meeting, moreover, two defendants (the Medical Director and the Faculty President) insisted that an on-call duty program was "not legally required and that no patient has ever been deprived of medical treatment."  Id.  As a result of this rejection, Plaintiff has been attempting to organize a subcommittee of three nephrologists, with him being one of them, to evaluate the two aforementioned proposed amendments to the bylaws.  However, despite "good faith attempts," this meeting has not been held.  Id. at ¶ 64.

Afterwards, on October 10, 2014, the Faculty President notified three proposed amendments to the bylaws from a nonparty nephrologist practice group: (1) a "disturbing conduct" policy, (2) a policy to be enforced when an MMC doctor refuses to provide medical care to a patient, and (3) a policy applicable to medical faculty members with disabilities.  Id. at ¶ 67.  Plaintiff submitted commentaries to these proposals on October 29, 2014.  Id.  Plaintiff cautioned that "similar policies have been . . . used in other hospitals for the purpose of marginalizing and illegally eliminating medical faculty."  Id. at ¶ 69.

On October 30, 2014, the medical faculty executive committee notified the agenda for a meeting to be held on November 4, 2014.  Id. at ¶ 71.  However, there was no mention of the proposed policies anywhere to be found on the agenda.  Id.  Nevertheless, at the meeting, these policies were mentioned despite not being opened up for discussion or even pointing out the commentaries that were submitted on these proposals.  Id. at ¶ 72.

Upon learning of this occurrence, Plaintiff submitted a letter to the Faculty President insisting that the "process of evaluation, discussion and consideration of the proposed policies . . . be continued."  Id. at ¶ 73.  In response to this letter, the secretary to the medical faculty office—a nonparty—informed Plaintiff that these policies had been approved at the November 4, 2014, meeting.  Id. at ¶ 74.  Displeased, Plaintiff objected to the approval of these policies on procedural grounds.  Id. at ¶ 75.  Furthermore, the procedure used was contrary to the MMC bylaws.  Id. at ¶ 85.

In response, Plaintiff received a second formal admonishment letter from the Medical Director on December 3, 2014, regarding the abandonment one of his hospitalized patients during his absences from September 20 to October 2, 2014.  Id. at ¶¶ 76-78.  However, as with the first admonishment letter, the accusation is deemed unfounded as this patient was under the care of another physician and Plaintiff's sole intervention had been as a consulting physician in a prior incident.  Id. at ¶ 77.  Moreover, the letter grants Plaintiff a "second opportunity" to "rectify his conduct."  Id. at ¶ 78.  However, if Plaintiff "incurs in the same conduct one more time," the administration would be forced to impose the applicable provisions of the bylaws.  Id.  In light of the approval of these controverted amendments to the bylaws, this warning is understood by Plaintiff to mean that his

"hospital privileges" would be summarily cancelled.  Id.  Thus, Plaintiff is fearful that his "next absence will be used as an excuse to expel him from the hospital and summarily cancel his hospital privileges."  Id. at ¶ 86.

In addition to this second admonishment letter, on December 12, 2014, the Faculty President wrote a letter to Plaintiff to refute his procedural challenges to the meeting held on November 4, 2014.  Id. at ¶ 79.  This letter asserts that any "suggestion for changes to the proposed policies needed the support of at least four members of the [m]edical [f]aculty and the review of the regulations committee"; moreover, the proponent of a change to a proposed policy needed to pose it openly during the meeting.  Id. at ¶ 80.  However, Plaintiff was never notified of these caveats.  Id. at ¶ 81.  Five months later, the instant lawsuit ensued.

Having introduced the myriad of factual allegations contained in the complaint and the appropriate standard with which to review them, the Court is now prepared to conduct its plausibility examination.

## IV.   PLAUSIBILITY ASSESSMENT

As previously adverted to, Plaintiff calls for the following forms of relief: compensatory damages, a permanent injunction, and a declaratory judgment.  These requests are based on the alleged deprivation of his civil rights, see 42 U.S.C. § 1983; the Social Security Act, specifically 42 U.S.C. § 1395dd(d)(2)(A); and the Declaratory Judgment Act, see 28 U.S.C. § 2201.    All of Plaintiff's causes of action are addressed below.   In conducting its scrutiny, the Court relies on well over a hundred allegations contained in the complaint and the identified provisions of the 50-page contract between

the Municipality and MMC, which is "integral to or explicitly relied upon in the complaint."[3]
See Clorox, 228 F.3d at 31.

### A. No Deprivation of Civil Rights

In the instant case, Plaintiff invokes a § 1983 cause of action grounded upon
alleged violations to his Fourteenth Amendment due process rights.  See Docket No. 1 at
¶¶ 4 and 86.  Section 1983 "was enacted pursuant to the authority of Congress to enforce
the Fourteenth Amendment."  Rendell–Baker v. Kohn, 457 U.S. 830, 838 (1982).
However, § 1983 "is not itself a source of substantive rights, but a method for vindicating
federal rights elsewhere conferred by those parts of the United States Constitution and
federal statutes that it describes."  See Baker v. McCollan, 443 U.S. 137, 145, n. 3 (1979);
Albright v. Oliver, 210 U.S. 266 (1994); Lockhart-Bembery v. Sauro, 498 F.3d 69, 74 (1st
Cir. 2007); Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617 (1st Cir. 2000).  In its entirety,
the statute reads as follows:

> 42 U.S.C. § 1983 Civil action for deprivation of rights
>
> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress, except that in any action brought against a judicial officer for an act
> or omission taken in such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or declaratory relief was
> unavailable. For the purposes of this section, any Act of Congress applicable
> exclusively to the District of Columbia shall be considered to be a statute of
> the District of Columbia.

---

[3] The English translation of the 50-page contract has been filed at Docket No. 88-1.

To summarize the above-mentioned statute, when assessing the imposition of liability under § 1983, we must ask "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989) (citing Parratt v. Taylor, 451 U.S. 527, 535 (1981)). Acting under color of state law requires that "the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (citing United States v. Classic, 313 U.S. 299, 326 (1941)). Despite not being one of the fifty states of the union, § 1983 applies to the Commonwealth of Puerto Rico with equal force. See Deniz v. Municipality of Guaynabo, 285 F.3d 142, 146 (1st Cir. 2002).

As far back as Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978), the Supreme Court ruled that municipal entities are subject to § 1983 liability. However, sovereign immunity is unavailable to municipalities because they are not states. See Jinks v. Richland County, 538 U.S. 456, 466 (2003).[4] Municipal liability cannot be based on the theory of respondeat superior. Monell, 436 U.S. at 691. "Under § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom," whether "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008); and Monell, 435 U.S. at 694. "A plaintiff can

---

[4] "'Eleventh Amendment immunity' . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." Alden v. Maine, 527 U.S. 706, 713 (1999) (reiterated in Northern Ins. Co. of New York v. Chatham County, Ga., 547 U.S. 189, 193 (2006)).

establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a municipal legislative body . . . or by a person with final policymaking authority." Welch, 542 F.3d at 941-42 (citing Owen v. City of Independence, 445 U.S. 622 (1980); and City of St. Louis v. Praprotnik, 485 U.S. 112, 123–24 (1988). "Liability may be imposed on a municipality for a single decision by a final policy maker." Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 62 (1st Cir. 2015) (citing Rodríguez–García v. Miranda–Marín, 610 F.3d 756, 770 (1st Cir. 2010)).

### i.   *State Inaction*

As earlier denoted, Plaintiff's § 1983 cause of action is grounded upon alleged violations to his Fourteenth Amendment due process rights. See Docket No. 1 at ¶¶ 4 and 86. However, Defendants urge the Court to dismiss these claims for lack of state action. Initially, it should be noted that, even at this early pleading stage, Plaintiff bears the burden of making a plausible showing of state action. See Grapentine v. Pawtucket Credit Union, 755 F.3d 29, 32 (1st Cir. 2014) (citing Mead v. Independence Ass'n, 684 F.3d 226, 231 (1st Cir. 2012)).

"Significantly, § 1983 does not apply to merely private conduct, no matter how discriminatory or wrongful." (internal quotations omitted). Grapentine, 755 F.3d at 31 (citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999); and Blum v. Yaretsky, 457 U.S. 991 (1982)). "To imbue an activity with state action there must be some non-neutral involvement of the state with the activity." 2 R. Rotunda & J. Nowak, Treatise on Const. L. § 16.3. "The state action inquiry is preliminary to, and independent of, the due process inquiry. If there is no state action, the plaintiff's claim fails." Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 8 (1st Cir. 2015) (citing Rendell–Baker, 457 U.S. at 838).

The "state action" evaluation has two prongs: "[f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (reiterated in Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008).   Moreover, "[b]ecause [the 'under color of state law'] requirement is the functional equivalent of the Fourteenth Amendment's 'state action' requirement, . . . 'we regard case law dealing with either of these formulations as authoritative with respect to the other, and we use the terminologies interchangeably.'"   Jarvis, 805 F.3d at 8 (citing Perkins v. Londonderry Basketball Club, 196 F.3d 13, 17 n. 1 (1st Cir.1999); and Santiago v. Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011)).

"[T]he amendments to the Constitution which protect individual liberties specifically address themselves to actions taken by the United States or a state.   Only the Thirteenth Amendment, which abolishes the institution of slavery, is also directed to controlling the actions of private individuals."   2 R. Rotunda & J. Nowak, Treatise on Const. L. § 16.1(a).   Therefore, unless the Thirteenth Amendment is in play, some form of "state action"—be it direct or indirect—is required in order for there to be § 1983 liability.   See Jarvis, 805 F.3d at 8 ("It is true—if somewhat of a tautology—that the Fourteenth Amendment applies only to state action performed by 'a person who may fairly be said to be a state actor.'") (citing Lugar, 457 U.S. at 937).   The First Circuit effectively summarizes the case law surrounding this "state action" requirement:

> Despite criticism from the academy, the public/private dichotomy remains embedded in our constitutional jurisprudence.   *See National Collegiate*

*Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). This dichotomy distinguishes between state action, which must conform to the prescriptions of the Fourteenth Amendment, and private conduct, which generally enjoys immunity from Fourteenth Amendment strictures. *See id.*; *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The line of demarcation between public and private action, though easily proclaimed, has proven elusive in application. And the Justices, mindful of the fact-sensitive nature of the inquiry, have staunchly eschewed any attempt to construct a universally applicable litmus test to distinguish state action from private conduct. Instead, they have directed lower courts to take a case-by-case approach, "sifting facts and weighing circumstances [so that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). (footnotes omitted).

Perkins, 196 F.3d at 18.

When confronted with a "state action" inquiry, the Court must first decide whether there has been any "direct state action."   See Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 491 (1st Cir. 1996). The analysis is generally quite straightforward: "[w]hen a legislature, executive officer, or a court takes some official action against an individual, that action is subjected to review under the Constitution, for the official act of any governmental agency is direct governmental action and therefore subject to the restraints of the Constitution."   2 R. Rotunda & J. Nowak, Treatise on Const. L. § 16.1(a).

If there is no "direct state action," the next step is deciding whether there is any "indirect state action."   As previously alluded to, the Supreme Court has "staunchly eschewed any attempt to construct a universally applicable litmus test to distinguish state action from private conduct."   Perkins, 196 F.3d at 18.  However, the First Circuit has "employed the following three tests to determine whether a private party fairly can be characterized as a state actor: the state compulsion test, the nexus/joint action test, and

the public function test." Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (citing Rockwell v. Cape Cod Hosp., 26 F.3d 254, 257 (1st Cir. 1994); and Perkins, 196 F.3d at 18–21). "A common thread binds these pathways. Each of them, from a slightly different coign of vantage, aims at the same destination: whether 'private actors [have] aligned themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp' of the Fourteenth Amendment." (alteration in original). Perkins, 196 F.3d at 18 (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253-54 (1st Cir. 1996)). However, "[t]he bar for such a showing is set quite high, and we have cautioned that it is only in rare circumstances that private parties can be viewed as state actors." (internal quotations and alterations omitted). Jarvis, 805 F.3d at 8 (citing Estades–Negroni, 412 F.3d at 4; and Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir.1992)).

Confronted with Defendants' "state action" defense, the Court proceeds to apply the aforementioned case law to the instant scenario.

### a. No Direct State Action

Properly assessing this argument requires careful consideration of each individual Defendant. Let us begin with the Municipality. The Municipality's liability is premised on the alleged "deliberate indifference" to the actions taken by MMC and its representatives. See Docket No. 1 at ¶ 1. At the outset, it should be noted that proving a state's "mere acquiescence" is not enough to prevail on a "deliberate indifference" theory. Blum, 457 U.S. 1004-05 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."); Ponce v. Basketball Fed'n of P.R., 760 F.2d 375, 379 (1st

Cir.1985); D'Amario v. Providence Civic Ctr. Auth., 783 F.2d 1, 3 (1st Cir. 1986).  However, even the most generous reading of the complaint would not allow for a plausible finding of "direct state action" by the Municipality.  Also meriting consideration is the fact that Plaintiff does not venture any "direct state action" argument to evade Defendants' powerful dismissal requests.

The fact that a municipality leases a public facility to a private party for its operation and administration, without more, does not result in the municipality being responsible for the injustices that occur within said facility.  While it is uncontested that the hospital facilities do belong to the Municipality, the complaint does not adequately plead that MMC—which only leases, operates, and administers these hospital facilities—belongs to the Municipality.  The Court explicitly considers some of these allegations below.

Plaintiff's July 18, 2012, email to the Medical Director, which was copied to the Municipality's mayor and several others, cannot reasonably be construed to infer "direct state action."  As previously alluded to, this email was aimed at MMC's noncompliance with the on-call duty roster statute.  However, even though the mayor never responded, there is simply no plausible inference contained in the complaint that would explain why the Municipality or its mayor should have gotten involved in this dispute between private parties.  See Yeo v. Town of Lexington, 131 F.3d 241, 252-53 (1st Cir. 1997) (en banc) ("while there may be rare occasions when a state has a duty to intervene in actions taken by private persons which could give rise to a state action finding, this is not one.") (citing Ponce, 760 F.2d at 379–80 (as paraphrased in Yeo: "no state action because the government had no affirmative duty to regulate amateur sports leagues"); DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189 (1989) (as paraphrased in Yeo:

"finding that the Due Process Clause imposes no affirmative duty on the government to protect citizens from deprivation of life, liberty or property by private actors")).  The Court explains its reasoning.

A hospital is not technically required to institute an on-call duty program in order to operate.  To be clear, this is one of the many criteria that must be satisfied by a hospital in order to be eligible for payments by the health insurance program for the aged and disabled.  See generally 42 U.S.C. § 1395cc.  However, there is no allegation or indication of any profit sharing between the Municipality and MMC.  Instead, the contract between the Municipality and MMC speaks of a flat monthly rental payment that is not based on the amount of profit earned in any particular month.  See Docket No. 54-1, pp. 18-20 (Article 5).  Moreover, the contract does not grant the Municipality any authority over how MMC is to run its business.  Furthermore, even if MMC was in contravention of federal law, the Municipality could have reasonably thought that this would be a matter for the corresponding federal authorities.  In the end, there is no plausible reason alluded to in the complaint that would support a finding that the mayor had a duty to force or persuade MMC to establish an on-call duty program.

In addition, Plaintiff's unsupported belief that the mayor actually had the power to force MMC to comply with the on-call duty program statute is simply not enough to plausibly allege state action.  Finally, the complaint and the response to the motions to dismiss repeatedly conclude that MMC is a "public hospital"; however, Plaintiff has no plausible factual allegation upon which to lay this conclusory statement.  Leasing a hospital facility to a private entity is just not enough.

With the Municipality out of the way, the remaining defendants are all private parties that simply cannot—by definition—effectuate any "direct state action."   Therefore, the Court finds that no plausible "direct state action" has been alleged in the complaint.  Thus, the Court turns its attention to the other side of the equation: "indirect state action."

### b. No Indirect State Action[5]

As detailed previously, the First Circuit has distilled the "indirect state action" teachings of the Supreme Court into three distinct tests: the state compulsion, the public function, and the nexus/joint action tests.  See, e.g., Estades-Negroni, 412 F.3d at 5. Defendants challenge the complaint by arguing that there is no state action on any of these three tests.  As earlier alluded to, regardless of the precise test being invoked, the burden is on Plaintiff to make a plausible showing of state action.  See Grapentine, 755 F.3d at 32 (citing Mead, 684 F.3d at 231).  Further, "[t]he bar for such a showing is set quite high, and we have cautioned that it is only in rare circumstances that private parties can be viewed as state actors." Jarvis, 805 F.3d at 8 (citing Estades–Negroni, 412 F.3d at 4; and Harvey, 949 F.2d at 1130) (internal quotations and alterations omitted).  With these qualifications at the forefront, the Court proceeds to discuss the trio of tests in seriatim fashion.

### State Compulsion Test

"Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.'" Estades-Negroni, 412 F.3d at 5 (citing Blum, 457 U.S. at

---

[5] The Magistrate Judge's excellent preliminary injunction analysis merges significantly with the instant state action analysis.  See Docket No. 101 at pp. 5-13.

1004).  However, there is simply no allegation or plausible inference whatsoever contained in the complaint that would go towards any showing of Municipal "coercion" or "encouragement" of the actions taken by MMC or its representatives.  Additionally, Plaintiff does not even attempt to seriously challenge Defendants' motions to dismiss on this particular ground.  See Docket No. 22.  As such, Plaintiff has failed to carry his burden of pleading state action under this first test.    No more need be said.

## Public Function Test

"[I]n accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.'"  Estades-Negroni, 412 F.3d at 5 (citing Blum, 457 U.S. at 1005).  The First Circuit's well-reasoned views on this test are expressed below:

> The public function analysis is designed to flush out a State's attempt to evade its responsibilities by delegating them to private entities. *See Barrios-Velazquez*, 84 F.3d at 494. In order to prevail on such a theory, a plaintiff must show more than the mere performance of a public function by a private entity; she must show that the function is one *exclusively* reserved to the State. *See id.* at 493-94. Government customarily involves itself in many types of activities, but few of those activities come within the State's exclusive preserve. To date, the short list of activities that have been held to satisfy this demanding criterion includes "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park." *United Auto Workers v. Gaston Festivals, Inc.,* 43 F.3d 902, 907 (4th Cir.1995) (citations omitted). When a plaintiff ventures outside such narrow confines, she has an uphill climb.  (emphasis in original).

Perkins, 196 F.3d at 18-19.  "Exclusivity is an important qualifier, and its presence severely limits the range of eligible activities."  Santiago, 655 F.3d at 69 (citing Rendell–Baker, 457 U.S. at 842 ("That a private entity performs a function which serves the public does not make its acts state action."))."

While up to the task, Plaintiff "cannot scale these heights." See Perkins, 196 F.3d at 19.  Indeed, the First Circuit closes the door on Plaintiff's public function argument in two sentences:

> The provision of health services is not and has never been the exclusive province of the state in Puerto Rico. See 24 P.R. Laws Ann. § 7001 (noting that "[f]rom the beginning of th[e twentieth] century, Puerto Rico's public policy has revolved around the attitude that the Government has the responsibility of offering direct health services" and that "[p]ursuant to such policy, two health systems have evolved," one public and one private). Thus, there can be no finding of state action under the public function test.

Estades-Negroni, 412 F.3d at 8-9.  The First Circuit's reasoning is founded on the fact that—because, since the beginning of the twentieth century, Puerto Rico has had an ever-evolving, separate private health system—health services are not "traditionally the exclusive prerogative" of Puerto Rico.  See Blum, 457 U.S. at 1005.  Of course, it is worth noting that the relied-upon Puerto Rico statute is still in force.  See 24 P.R. Laws Ann. § 7001.  As such, Plaintiff must fail the difficult public function test.

### Nexus/Joint Action Test[6]

Plaintiff's best chance to successfully traverse this "state action" hurdle is via this final vehicle.  The First Circuit explains the ultimate goal of this test as follows:

> The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]."  (alterations in original).

Estades-Negroni, 412 F.3d at 5 (citing Bass v. Parkwood Hosp., 180 F.3d 234, 242 (5th Cir.1999); and Perkins, 196 F.3d at 21).  "The requisite nexus is premised on a showing of

---

[6] The First Circuit also refers to this test as the "symbiotic relationship test."  Santiago, 655 F.3d at 73 n. 6 (1st Cir. 2011) ("Our cases sometimes refer to the 'nexus/joint action test' as the 'symbiotic relationship test.' See, e.g., Perkins, 196 F.3d at 18. Whatever the nomenclature, the test remains the same.").

mutual interdependence." Santiago, 655 F.3d at 71 (citing Burton, 365 U.S. at 723–25; and Ponce, 760 F.2d at 381).

A well-respected treatise on the subject matter masterfully classifies the case law regarding this test into three general categories: (1) "cases where the private actor is subjected to extensive regulation by the government," (2) "cases involving a wide range of physical and economic contacts between the actor and government," and (3) "cases where the government has provided some sort of direct aid or subsidy to the private actor."  2 R. Rotunda & J. Nowak, Treatise on Const. L. § 16.4.  However, "[e]ven if an entity has a relationship to the government that cuts across all three of these categories[,] . . . it is not necessarily an entity that should be treated like the government and made subject to constitutional restrictions on its actions." Id.  Thus, in the end, the Court must ultimately "take a case-by-case approach, 'sifting facts and weighing circumstances [so that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance.'" Perkins, 196 F.3d at 18 (citing Burton, 365 U.S. at 722).

In conducting this required "totality of the circumstances" assessment, there are several factors that the First Circuit has previously identified as significant.  First, "[t]he 'most salient' factor in this determination 'is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs.'" Santiago, 655 F.3d at 71 (citing Perkins, 196 F.3d at 21).  Second, "[a] private party's use of public facilities may weigh in the balance." Id. (citing Burton, 365 U.S. at 723).  Third, "the state's sharing of profits generated from the private party's rights-depriving conduct" may also weigh in the balance. Id. (citing Barrios–Velázquez, 84 F.3d at 494).  However, this third factor is "[s]ubject to certain caveats":

> First, this factor implicates only profits arising from the challenged conduct, rather than from the relationship as a whole. *See* [*Barrios–Velázquez*, 84 F.3d at 494]; *Ponce*, 760 F.2d at 382. Second, for profit-sharing to be relevant, the challenged conduct must be indispensable to the financial success of the joint project. *See Burton*, 365 U.S. at 723-24, 81 S.Ct. 856; *Ponce*, 760 F.2d at 381-82.

Perkins, 196 F.3d at 21.  Of course, "the lack of a financial partnership is not necessarily dispositive."  Barrios-Velazquez, 84 F.3d at 494 (citing Rodríguez–García, 904 F.2d at 98–99).  This is because "[t]he test is one of interdependence and joint participation, rather than one of financial enrichment."  Rodriguez-Garcia, 904 F.2d at 98.

The First Circuit also recognized that when conducting this test, "the law of Eleventh Amendment immunity is instructive, although not congruent."  Rodriguez-Garcia, 904 F.2d at 98.  Accordingly, the First Circuit proceeded to list "[t]he factors to be taken into account when determining if an entity is an alter ego of the state."  For the sake of efficiency, the Court lists only those factors that do not overlap with those that were previously mentioned and numbers them in accordance with the discussion herein: fourth, "whether [the entity] performs a governmental function"; fifth, "to what extent [the entity] is financed independently of the state treasury"; sixth, "if a judgment sought to be entered against the [entity] will be satisfied out of the state treasury"; seventh, "whether the entity has been incorporated"; eighth, "whether [the entity] has the power to sue and be sued and to enter into contracts"; ninth, "whether [the entity's] property is immune from state taxation"; and tenth, "whether the sovereign has immunized itself from responsibility for the [entity's] operations."  Id. at 98-99 (citing Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1044 (1st Cir. 1988)).

Having identified the multitude of factors expressly used by the First Circuit, all that remains is for the Court to apply them to the factual scenario pleaded in the complaint.

Yet, any reasonable reading of the complaint would not allow Plaintiff to carry his burden and satisfy the nexus/joint action test.  The Court proceeds to discuss some of the more critical factors.

The first and "most salient factor"—the extent to which MMC's day-to-day affairs are independent from state interference—is not in Plaintiff's favor.  A generous reading of the complaint, however, would not allow for any plausible inference favoring Plaintiff on this point.  Although the Municipality—the owner of the hospital facilities—does have a contract authorizing MMC "to lease, operate, and administer the facilities" in exchange for about $25 million, there is not the slightest indication in the complaint (or the contract itself) that the Municipality has any say in MMC's day-to-day affairs.  Moreover, in the response to the motions to dismiss, Plaintiff brings the Court's attention to a provision of the contract that provides that an employee of the Municipality will act as the administrator of the contract; represent the Municipality and its mayor; be delegated all "faculties, rights, and obligations" that correspond to the Municipality under the contract and the applicable laws; and have an office space inside the medical center.  See Docket No. 22 at ¶ 38 (mistakenly citing Section 8.4); Docket No. 54-1, pp. 26-27 (Section 8.3).  However, careful examination of this contractual proviso hurts Plaintiff's argument infinitely more than it helps: "[t]he [parties] understand that, despite the Contract Administrator having an office at the Hospital's facilities, he/she shall have no type of authority over MMC's employees or any of its Subcontractors . . ."  Docket No. 54-1, p. 27 (Section 8.3).  With the most important factor clearly in Defendants' favor, Plaintiff is now forced to make up ground with the other less-significant factors.

The second factor—MMC's use of public facilities—is obviously in Plaintiff's favor. According to the complaint itself and the incorporated contract, the hospital facilities belong to the Municipality.  In addition, Plaintiff notes that Article 4.1(a) of the contract states that the license obtained by MMC for the administration and operation of the hospital shall belong to the Municipality.  Docket No. 54-1, pp. 14-16.  Thus, if the contract is ever terminated, the Municipality would have the exclusive right to use this license. Nevertheless, as the Magistrate Judge noted in his report and recommendation, several courts have ruled that, without more, the leasing of a hospital facility from a government entity is insufficient to establish state action:

> Indeed, the courts that have considered the issue of whether leasing a hospital premises from a government entity constitutes state action have come to the same conclusion. Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 840-41 (11th Cir. 1993) (finding that private entity that leased hospital from government entity but had control to hire and fire employees, enforce rules and regulations, and operate and administrate the hospital was not "so intertwined in a symbiotic relationship as to satisfy the nexus/joint action test"); Drs. Steuer and Latham, P.A. v. National Medical Enterprises, Inc., 672 F. Supp. 1489, 1524 (D.S.C. 1987), aff'd, 846 F.2d 70 (4th Cir. 1988) (concluding that private hospital was not a state actor despite leasing building from county and agreeing to retain prior county medical staff); Greco v. Orange Memorial Hospital Corp., 513 F.2d 873, 881 (5th Cir. 1975) (lease with county did not make hospital policy state action where the private hospital corporation was "ultimately responsible for the daily maintenance, upkeep, and operation of the facility"); and Spencer v. Cmty. Hosp. of Evanston, 393 F. Supp. 1072, 1077 (N.D. Ill. 1975) ("Leasing of land by a hospital from a state agency is insufficient to convert a private hospital into one acting 'under color of' state law." (citing Akopiantz v. Bd. of County Com'rs., 65 N.M. 125, 333 P.2d 611 (1959)).

Docket No. 101 at p. 12.

Next, the third factor—the sharing of profits generated from MMC's rights-depriving conduct—benefits Defendants.  At the expense of repetition, the Court notes that this factor only references profits that stem from the challenged conduct itself and are

"indispensable to the financial success of the joint project."  See Perkins, 196 F.3d at 21.
Yet, the complaint contains no such allegation—be it explicit, implicit, plausible, or
implausible—to support such a finding.   Plaintiff attempts to dissuade the Court from
making such a finding by invoking the *Burton* case.  See Burton, 365 U.S. 715.

"In *Burton*, the Court found state action where the state leased public property to a
private restaurant owner, who maintained a racially discriminatory policy, acknowledged to
be indispensable to the success of the venture."  Barrios-Velazquez, 84 F.3d at 494 (citing
Burton, 365 U.S. at 723–24).   However, the complaint simply contains no allegation or
plausible inference that the Municipality profited from any of the challenged conduct.  See
Id.  Further, although faced with the threat of having his claim dismissed, Plaintiff has not
pointed the Court to any provision of the 50-page contract that mentions any sort of profit
sharing.  Although not obligated to, the Court read over the unidentified portions of the
contract in search of any such clause; this review came up empty.  On the contrary, as
recognized by Defendants, the contract does speak of a flat monthly rental payment that
MMC must pay to the Municipality, a payment which is unaffected by the amount of profit
earned in any particular month.  See Docket No. 54-1, pp. 18-20 (Article 5); see also
Perkins, 196 F.3d at 22-23.  This factor adds more weight to Defendants' side of the
scales.

With respect to the fourth factor (whether MMC performs a governmental function),
there is significant overlap with the Court's prior "public function" analysis.  Again, the
Court finds, as the First Circuit once did, that "[t]he provision of health services is not and
has never been the exclusive province of the state in Puerto Rico."  Estades-Negroni, 412

F.3d at 8-9 (citing See 24 P.R. Laws Ann. § 7001).  As such, the Court finds that fourth factor also favors Defendants.

In the end, what it boils down to is Plaintiff's failure to carry his burden of pleading state action under this test.  Hence, the majority of these factors—including the "most salient factor"—counsel this Court to find that the complaint pleads no state action under the nexus/joint action test.  The Court is not breaking any new ground in doing so; on the contrary, even before the more rigorous plausibility standard was ever set in stone, the First Circuit properly dismissed other complaints for failing to adequately plead state action under the Rule 12(b)(6) rubric.  See, e.g., Estades-Negroni, 412 F.3d at 5; Cape Cod Nursing Home Council v. Rambling Rose Rest Home, 667 F.2d 238, 239 (1st Cir. 1981); Alberto San, Inc., 522 F.3d at 4-5.  The Court finds the same to be true here: the complaint fails to plead any plausible state action under this test, Plaintiff's brief response to the nexus/joint action inquiry is somewhat conclusory and rather unpersuasive, Plaintiff has not identified any provision of the 50-page contract that would move the Court to rule otherwise, and, more generally, Plaintiff has failed to carry his required burden under this state action rubric.[7]  Hence, Plaintiff's § 1983 action cannot evade dismissal.[8]

**B. No Private Right of Action**

We now arrive at Plaintiff's cause of action under the Social Security Act.  The Court begins by introducing the statute relied upon by Plaintiff to support this claim:

---

[7] It should be noted that Plaintiff's preliminary injunction arguments provided a more vigorous nexus/joint action challenge.  However, even if the Court were to extrapolate this more detailed argument to apply to the instant Rule 12(b)(6) discussion, the ruling would still be the same.  See Docket No. 101 at pp. 7-13.  The majority of factors—including the "most salient factor"—would still require dismissal.

[8] Further, lack of state action notwithstanding, Plaintiff's procedural due process claims would still have to be dismissed for the same reasons that were eloquently illustrated by the Magistrate Judge.  See Docket No. 101 at pp. 13-15.

> 42 U.S.C. § 1395dd Examination and treatment for emergency medical conditions and women in labor
>  . . .
> (d) Enforcement
>  . . .
>    (2) Civil enforcement
>       (A) Personal harm
>       Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of **this section** may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate. (emphasis provided).

However, as accentuated above, this statute creates a cause of action only for violations of § 1395dd itself.  This fact is fatal to Plaintiff's latest call for relief.

Perpetuating what has now become a common theme, the complaint is unclear as to what particular provision of § 1395dd has been violated.  Carefully examining the aforementioned statute, it may be that Plaintiff intended to invoke the whistleblower protections of § 1395dd(i).[9]  Specifically, it is possible to venture an argument, loosely based on the factual underpinnings contained in the complaint, that MMC and its representatives have taken adverse actions against Plaintiff for reporting the fact that the required on-call duty program has not been implemented.  Alternatively, the Court may rely on the slight clarification issued in the response to the motions to dismiss: Plaintiff stated that this cause of action is premised on Defendants' repeated failures to actually

---

[9] To be precise, this particular subsection of the statute reads as follows:

> § 1395dd. Examination and treatment for emergency medical conditions and women in labor
>  . . .
> (i) Whistleblower protections
> A participating hospital may not penalize or take adverse action against . . . any hospital employee because the employee reports a violation of a requirement of **this section**. (emphasis provided).

implement the required on-call duty program.  See Docket No. 22 at ¶¶ 59-66.  The Court, generously, shall pursue the validity of this cause of action on both theories.

Regardless of which of these two streams is navigated, Plaintiff's § 1395dd(d)(2)(A) cause of action has a major flaw: the on-call duty requirement is found in § 1395cc, not § 1395dd.  This kills two birds with one stone.  To be clear, the civil enforcement provision at § 1395dd(d)(2)(A)—which creates a private cause of action for violations of *that particular statute*—does not extend to defalcations of the requirements of other statutes.[10]

First, the Defendants' actual failures to implement the on-call duty program would be a violation of § 1395cc(a)(1)(I)(iii), not § 1395dd.  Second, the whistleblower theory under § 1395dd(i) must fail for the same reason, albeit with a slightly more nuanced analysis.  Section 1395dd(i) only grants whistleblower protection for the reporting of violations of any § 1395dd requirement.  See 42 U.S.C. § 1395dd(i) ("A participating hospital may not penalize or take adverse action against . . . any hospital employee because the employee reports a violation of a requirement of this section."); see also footnote 8.  Hence, reporting Defendants' failure to establish an on-call duty roster—which would be to report a failure to comply with the § 1395cc(a)(1)(I)(iii) requirement—does not confer whistleblower protection to Plaintiff.  Furthermore, Plaintiff has failed to provide any case law to the contrary.

In a futile attempt to refute Defendants' motions to dismiss, Plaintiff proudly cites two agency regulations—42 C.F.R. §§ 489.20(r)(2) and 489.24(j)—that go into more detail about the on-call duty program requirements.  Yet, these particular regulatory provisions do not reference any of the requirements under § 1395dd and speak nothing of creating

---

[10] Of course, this is not to say that these requirements can be ignored with impunity.  There are indeed consequences for not complying with the § 1395cc requirements; however, being subjected to a private cause of action is not one of them.

any sort of private right of action for § 1395dd violations.  It is unclear whether Plaintiff provided these citations to argue that the regulations themselves are the sources of a private right of action.  Regardless, the Supreme Court has spoken otherwise: "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."  Alexander v. Sandoval, 532 U.S. 275, 291 (2001) (citing Touche Ross & Co. v. Redington, 442 U.S., at 577, n. 18 (1979)).

Moreover, the claim would still require dismissal should Plaintiff have brought the instant claim directly under § 1395cc.  This is mainly due to the fact that there is no statute that explicitly creates a private right of action for § 1395cc violations.  However, this lack of express authority is not dispositive as a statute may contain an implied private right of action.  Although, "[i]n the absence of 'rights-creating language,' courts rarely 'impute to Congress an intent to create a private right of action.'"  Gonzaga Univ. v. Doe, 536 U.S. 273, 284 n. 3 (2002).

In Cort v. Ash, 422 U.S. 66 (1975), the Supreme Court established a four-prong test geared towards assessing whether a statute contains an implied private cause of action.  The most relevant portion of the case reads as follows:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. **First**, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? **Second**, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *See, e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (Amtrak). **Third**, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? *See, e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, 95 S.Ct. 1733,

1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). **And finally**, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *See Wheeldin v. Wheeler*, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); *cf. J.I. Case Co. v. Borak*, 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394—395, 91 S.Ct. 1999, 2003—2004, 29 L.Ed.2d 619 (1971); id., at 400, 91 S.Ct., at 2006 (Harlan, J., concurring in judgment).  (emphasis provided).

Id. at 78.   However, the methodology used in the aforementioned case stands on somewhat shaky ground.  Two subsequent cases were decided by the Supreme Court that seemingly diluted the four-prong analysis into a one-prong analysis: whether or not there was legislative intent to create a private right of action.  As such, the other three prongs are apparently used only to assist in making a finding as to that one critical prong.  See generally Touche Ross, 442 U.S. at 575-76; Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 18 (1979).[11]  Notwithstanding, despite its criticism, the determination in *Cort* has not been expressly overruled; therefore, the Court would still resort to the four-prong analysis while giving particular attention to the second prong.  Although Plaintiff has eschewed any attempt to assert an implied private right of action, it would appear that all

---

[11] Justice Scalia wrote a concurring opinion that sternly questions how *Cort* can coexist with subsequent caselaw:

> I also find misleading the Court's statement that, in determining the existence of a private right of action, "we have relied on the four factors set out in *Cort v. Ash*, ... along with other tools of statutory construction." *Ante*, at 516. That is not an accurate description of what we have done. It could not be plainer that we effectively overruled the *Cort v. Ash* analysis in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-576, 99 S.Ct. 2479, 2488-2489, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979), converting one of its four factors (congressional intent) into *the determinative factor*, with the other three merely indicative of its presence or absence. Compare *Cort v. Ash*, supra, 422 U.S., at 78, 95 S.Ct., at 2088, with *Transamerica*, *supra*, 444 U.S., at 23-24, 100 S.Ct., at 249.  (emphasis in original)

Thompson v. Thompson, 484 U.S. 174, 189 (1988).

four *Cort* factors disfavor a finding of one here.  Hence, Plaintiff's second cause of action cannot survive a Rule 12(b)(6) motion to dismiss.

### C. Equitable Relief

The Court comes now to the two elephants in the room: the declaratory judgment and permanent injunction requests.  Plaintiff calls upon the Court to, pursuant to the authority provided by 28 U.S.C. § 2201, enter a declaratory judgment that pronounces the following: that Plaintiff's hospital privileges and medical practice are constitutionally protected property rights; that the procedure used by Defendants to approve the policies on November 4, 2014, was illegal; and that Defendants' approval of these November 4, 2014, policies was actually a sham to marginalize and summarily dismiss disliked physicians.  Docket No. 1 at ¶¶ 139 and 141-42.  In addition, Plaintiff seeks permanent injunctive relief demanding that Defendants be ordered to comply with the federal laws and regulations requiring the implementation of the on-call duty program and abolish the policies approved by Defendants on November 4, 2014.  Docket No. 1 at ¶¶ 140 and 143.

Although Defendants request dismissal of the entire complaint, no argument has been provided as to these latest causes of action.  Of course, the Court may perhaps decide the validity of these claims based on what has already been written here today.  However, the preferred praxis is to allow the parties an opportunity to express themselves prior to rendering a ruling.  Therefore, the parties are hereby ordered to file memorandums to this effect within twenty-one days.

### V.   CLOSURE

For all of the foregoing reasons, Defendants' motions to dismiss are hereby **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's cause of action under 42 U.S.C. §

1983 shall be **DISMISSED** for his failure to plausibly plead state action.   Moreover, Plaintiff's cause of action under 42 U.S.C. § 1395dd(d)(2)(A) is also **DISMISSED** as there is no private right of action for the violations alleged.   Finally, the parties are to brief the Court of the viability of Plaintiff's claims for declaratory and permanent injunctive relief **on or before April 20, 2016**.

In closing, the District Court must recognize the excellent work performed by the Honorable Magistrate Judge Marcos E. López, who accepted the referral on short notice as the undersigned was tending to other official court functions.   Specifically, the undersigned was presiding over a criminal jury trial in case 14-cr-236 (DRD) from June 29 to July 9, 2015.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of March, 2016.

*/S/ Daniel R. Domínguez*
DANIEL R. DOMÍNGUEZ
United States District Judge